# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| RODERICK HARRIS, JOHN MAY, DERRICK DUNLAP, GEORGE WYNN, ANDREW CARRIER | § § § § | |
| *Plaintiffs*, | § § | CIVIL ACTION NO.  4:19-CV-00016 |
| | § | Judge Mazzant |
| v. | § § | |
| BMW OF NORTH AMERICA, LLC, et al, | § § § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Motion to Strike and Exclude Plaintiffs' Expert Designation (Dkt. #54).  Having considered the motion and the relevant pleadings, the Court finds that Defendant's motion should be **GRANTED in part and DENIED in part**.

## BACKGROUND

Plaintiffs Roderick Harris, John May, Derrick Dunlap, George Wynn, and Andrew Carrier are Texas residents and purchasers of BMW vehicles.  Defendant, BMW of North America, LLC, is a Delaware limited liability company and the wholesale distributor of BMW vehicles sold in North America.  Specifically, Defendant is engaged in the business of importing, assembling, marketing, distributing, and warranting BMW vehicles that are ultimately sold or leased in North America.  Defendant does not itself sell or lease BMW vehicles; instead, it leaves the business of selling or leasing BMW vehicles to its network of regional and local BMW dealers.

Plaintiffs each own a BMW vehicle equipped with a V8, twin-turbocharged engine, referred to as the "N63."  BMW released the N63 in 2008, advertising it as the next generation

high performance engine designed for certain BMW vehicles, including 5 series, 6 series, 7 series, X5, and X6 models produced from 2009–2014.  Apparently, vehicles equipped with the N63 have experienced a variety of problems since the engine's release in 2008.  In particular, purchasers of N63-powered vehicles, including Plaintiffs, claim that the N63 consumes excessive amounts of engine oil, requiring frequent oil changes and engine repairs.  And this alleged oil consumption defect, Plaintiffs claim, has diminished the value of their vehicles.

The amended complaint provided the following details about Plaintiffs and the subject vehicles: Roderick Harris purchased a 2010 BMW 5 Series 550i on October 30, 2013 for $51,312.80; John May purchased a 2012 BMW X5 XDrive 50i on December 26, 2015 for $51,607.14; Derrick Dunlap purchased a 2014 BMW 5 Series 550i on July 31, 2017 for $45,810.72; George Wynn purchased a 2013 BMW 7 Series 750i on August 6, 2014 for $78,776.40; and Andrew Carrier purchased a 2012 BMW 7 series 750i on December 21, 2015 for $44,974.50.

Plaintiffs assert multiple grounds for relief.  First, Plaintiffs claim that Defendant made and subsequently breached express and implied warranties as to each vehicle.  Second, Plaintiffs claim that Defendant's breach of warranty and failure to disclose the engine defects despite having knowledge of the defects constituted deceptive trade practices under the Texas Deceptive Trade Practices-Consumer Protection Act.

On September 25, 2020, Defendant filed the present motion (Dkt. #54).  On October 20, 2020, Plaintiffs filed their sealed response (Dkt. #64).  On October 26, 2020, Defendant filed its reply (Dkt. #74).  On November 2, 2020, Plaintiffs filed their sur-reply (Dkt. #85).

## LEGAL STANDARD

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue.  FED. R. EVID. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed courts to function as gatekeepers, and determine whether expert testimony should be presented to the jury.  509 U.S. 579, 590–93 (1993).  Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The party offering the expert's testimony has the burden to prove that: (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. *Daubert*, 509 U.S. at 590–91.  A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education."  FED. R. EVID. 702.  Moreover, to be admissible, expert testimony must be "not only relevant but reliable."  *Daubert*, 509 U.S. at 589. "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony."  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kuhmo*, 526 U.S. at 147).

In deciding whether to admit or exclude expert testimony, the Court should consider numerous factors.  *Daubert*, 509 U.S. at 594.  In *Daubert*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally

accepted in the relevant scientific community.  *Id.* at 593–94; *Pipitone*, 288 F.3d at 244.  When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate."  *Daubert*, 509 U.S. at 595.

The *Daubert* factors are not "a definitive checklist or test."  *Id.* at 593.  As the Supreme Court has emphasized, the *Daubert* framework is "a flexible one."  *Id.* at 594.  The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue. *Kuhmo*, 526 U.S. at 152.  Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court.  *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000) (citations omitted).

## ANALYSIS

Defendant asks this Court strike and exclude the testimony of Darren Manzari ("Manzari"). In support of its request, Defendant asserts that "the opinions expressed in Manzari's report are neither reliable nor relevant under the familiar test established by *Daubert* . . . ." (Dkt. #54 at p. 1).  Specifically, Defendant claims that "Manzari's report is not based on sufficient facts or data, is not the product of any reliable or generally accepted principles or methodologies, is beset by logical fallacy and unsound reasoning, does not apply any well-founded principles or cogent methods to the facts in this case, and includes an impermissible conclusion of law" (Dkt. #54 at p. 1).

Plaintiffs respond that Defendant's motion is "almost entirely unsupported by citation to authority" (Dkt. #64 at p. 1).  Further, Plaintiffs state that "Mazari's report and opinions are based on a reliable methodology and should not be excluded" (Dkt. #64 at p. 1).

Manzari offers five opinions upon which Defendant takes issue: "(1) [t]he N63 engines in general 'suffer from a problem of defective valve stem seals'[1]; (2) [Defendant] concealed from consumers its knowledge that the N63 engines suffer from defective valve stems; (3) [e]ach of the Plaintiffs' vehicles suffers from defective valve stem seals, which [Defendant] did not remedy or resolve in a reasonable period of time; (4) [t]he Plaintiffs' vehicles were not suitable for their ordinary purpose; and (5) [t]he value of Plaintiffs' vehicles were each substantially reduced by defective valve stem seals" (Dkt. #54 at p. 2).  The Court will address each opinion in turn.

## I.     The N63 engines in general "suffer from a problem of defective valve stem seals"

Defendant challenges Manzari's first opinion on the basis that Manzari "makes at least two unsupported and unsubstantiated leaps of logic: (a) because some N63 engines were described as having a symptom of excessive oil consumption, all N63 engines suffer from excessive oil consumption, and (b) because excessive oil consumption is one symptom of leaking valve stem seals, then the cause of all instances of excessive oil consumption is leaking valve stem seals" (Dkt. #54 at pp. 4–5).

Plaintiffs assert that Defendant's claim is "without merit" because "Manzari never opined that all N63 engines suffer from defective valve stem seals" (Dkt. #64 at p. 5)[2].  Further, Plaintiffs contend that "[Defendant] did not object to [Manzari's] actual opinion,"  but rather "[i]t objected only to an opinion that is not contained" within Manzari's report (Dkt. #64 at p. 6).  Plaintiffs also offer an alternative argument if the Court determines that Defendant's argument should not be summarily denied—namely, that "Manzari's opinion is based on sufficient facts and a reliable methodology" (Dkt. #64 at p. 6).

---

[1] Plaintiffs phrase Manzari's first opinion slightly differently: "Defective valve stem seals caused excessive oil consumption" (Dkt. #64 at p. 3).  The Court will address the discrepancy in language when addressing the opinion.
[2] This contention by Plaintiffs accounts for the discrepancy in language discussed in n.2 above.

Manzari's report generally states that "[Defendant's] N63 [e]ngines suffer from a problem of defective valve stem seals" (Dkt. #54, Exhibit 1 at p. 15).  Nowhere in the report does Manzari assert that all N63 engines suffer from the oil consumption defect, however.  Manzari's report therefore does not make the "unsupported and unsubstantiated leap[] of logic" asserted by Defendant (Dkt. #54 at pp. 4–5).  The Court rejects Defendant's first argument as to Manzari's first opinion.

Defendant also claims that Manzari made a second "unsupported and unsubstantiated leap[] of logic" when he opined that "because excessive oil consumption is one symptom of leaking valve stem seals, then the cause of all instances of excessive oil consumption is leaking valve stems" (Dkt. #54 at p. 5).  Defendant further contends that "[n]owhere does [Manzari] provide sufficient facts and a reliable methodology for making the jump from the asserted fact that excessive oil consumption is a symptom of leaking valve stem seals to the expert conclusion that all N63 engines therefore suffer from leaking valve stem seals" (Dkt. #54 at p. 5).

"Whether an expert's testimony is reliable is a fact-specific inquiry."  *Burleson v. Texas Dept. of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004) (citing *Skidmore v. Precision Printing and Pkg., Inc.*, 188 F.3d 606, 618 (5th Cir. 1999)).  Although every *Daubert* factor does not necessarily apply under every set of facts, "the existence of sufficient facts and a reliable methodology is in all instances mandatory."  *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007).  "The district court is charged with making 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *McGill v. BP Exploration & Production, Inc.*, No. 19-60849, 2020 WL 6038677, at *2 (5th Cir. 2020) (quoting *Daubert*, 509 U.S. at 592–93).

Manzari did not test any N63 Engines, nor did he conduct any other analysis subject to the *Daubert* factors. *See Black v. Food Lion, Inc.*, 171 F.3d 308, 311–12 (5th Cir. 1999) ("In the vast majority of cases, the district court first should decide whether the factors mentioned in *Daubert* are appropriate."). Manzari relied upon reports, literature, and his own experience in reaching his overall conclusion.

Manzari considered several documents in reaching his opinion that defective valve stem seals caused excessive oil consumption—including a report created by Michael Murray ("Murray"). Defendant employed Murray as its senior engineer. Murray's report, titled "N63 Oil Consumption — High Mileage — Valve Seals Worn" ("Oil Consumption Report"), noted that dealers faced with customers complaining of excessive oil consumption "had determined that the cause was worn and leaking valve stems" (Dkt. #54, Exhibit 1 at p. 11). Manzari "agree[d] with Mr. Murray that if the N63 [e]ngine consumes excessive amount[s] of oil" and yet "there are no external oil leaks and crankcase ventilation hoses and turbo seals are not leaking oil, then it suggests valve stem seals are defective and in need of replacement" (Dkt. #54. Exhibit 1 at p. 11). In addition to documents, Manzari also utilized his knowledge of internal combustion engines and his experience in the automotive industry to reach his conclusion—knowledge and experience that appears unchallenged by Defendant.

"[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142. Manzari took Defendant's own internal reports and applied the information contained therein to his own knowledge and experience. In agreeing with Murray's recommendation contained within the Oil Consumption Report, Manzari eliminated alternative possibilities for defects in the engine before ultimately concluding that the valve stem seals were worn. Because

Manzari utilized a reliable methodology in reaching his conclusion—namely, coupling his experience and knowledge with a review of various internal documents—the Court declines to exclude this opinion.  Rather, Defendant may employ "vigorous cross-examination, presentation of contrary evidence, and [a] careful instruction on the burden of proof" to attack Manzari's first opinion.  *Daubert*, 509 U.S. at 596.

## II.   Defendant concealed from consumers its knowledge that the N63 Engines suffer from defective valve stems

Defendant contends that Manzari's second opinion is "an improper comment on the evidence and attempt to offer a conclusion of law" (Dkt. #54 at p. 9).   Plaintiff responds that "[Defendant] again provided no analogous case law holding or even suggesting that an expert opinion that a[n] automobile company or similar type of manufacturer or seller was attempting to conceal or misrepresent information from its customers was a conclusion of law, and the Plaintiffs have been unable to find any" (Dkt. #64 at p. 8).

Although it is well settled that an expert may not give legal conclusions, *see Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) (first citing *United States v. Fogg*, 652 F.2d 551, 557 (5th Cir. 1981); and then citing *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977)), an expert may "testify in the form of an opinion or otherwise" when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to *determine a fact in issue*."  Fᴇᴅ. R. Eᴠɪᴅ. 702(a) (emphasis added).

One of the facts in issue in this case is whether Defendant concealed its knowledge of the defective valve stems.  Manzari's opinion that Defendant did, in fact, conceal the defect does more than "supply the jury" with only his "view of how its verdict should read."  *Owen*, 698 F.2d at 240. Manzari offers his expert opinion—reached after considering documents and applying the information contained in the documents to his knowledge and experience—on a hotly contested

8

fact that the jury will ultimately have to determine.  The Court therefore agrees with Plaintiffs that whether Defendant concealed from consumers its knowledge that the N63 engines suffer from defective valve stems is a question of fact on which Manzari may properly opine.  Thus, the Court declines to exclude Manzari's second opinion.

III.    **Each of the Plaintiffs' vehicles suffers from defective valve stem seals, which Defendant did not remedy or resolve in a reasonable period of time**

Defendant contends that "Manzari's next leap of logic is to opine that engines in each of the Plaintiffs' vehicles suffer from [defective valve stem seals]" (Dkt. #54 at p. 5).  Defendant states that Manzari "rel[ies] on his opinion that all N63 engines in general suffer from defective valve stem seals" when asserting this opinion (Dkt. #54 at p. 5).  Central to Defendant's argument is that "[t]he sole factual predicate for [Manzari's] assertion is the rate at which Plaintiffs added or claimed to add additional oil" (Dkt. #54 at p. 5).  Defendant claims that "[n]owhere does Manzari provide any explanation for why adding oil in the varying amounts alleged by Plaintiffs are all so 'excessive' as to be evidence of an engine defect"—rather, "Manzari simply asserts that 'it should not be considered normal practice to require top ups between routine service intervals'" (Dkt. #54 at p. 6) (internal citation omitted).

Plaintiffs respond that "[Defendant] once again misstated Mr. Manzari's opinions and methodology" and "[e]ven the most cursory review of Mr. Manzari's report will show that there was no sole factual predicate for his opinions" (Dkt. #64 at p. 9) (emphasis omitted).  Rather, Plaintiffs assert that "[Manzari] arrived at his opinions by applying his own expertise to his review and analysis of documents relevant to each Plaintiff's vehicle, [Defendant's] own opinions as to the cause, and [Manzari's] consideration and rejection of a list of possible alternatives" (Dkt. #64 at p. 9).

Manzari examined various documents pertaining to each Plaintiff's vehicle, including: (1) Defendant's warranty history for the vehicle owned by Carrier; (2) Carrier's vehicle purchase records; (3) Defendant's warranty history for the vehicle owned by Dunlap; (4) Dunlap's vehicle purchase records; (5) Defendant's warranty history for the vehicle owned by Harris; (6) Harris's vehicle purchase records; (7) the dealership service records for Harris's vehicle; (8) Defendant's warranty history for the vehicle owned by May; (8) May's vehicle purchase records; (9) the dealership service records for the vehicle owned by May; (10) Defendant's warranty history for the vehicle owned by Wynn; (11) Wynn's vehicle purchase records; and (12) the dealership service records for the vehicle owned by Wynn.   Manzari also considered documents produced by Defendant in both the present action and the *Schneider* action[3].   Manzari's application of his experience and knowledge to his review of the documents presents a reliable methodology—one that certainly withstands Defendant's request for exclusion.

In its reply, Defendant first raised the issue that "Manzari performs none of his own investigation or analysis to support his opinions" and, in fact, "Manzari has never inspected Plaintiffs' vehicles to allow him to confirm his suspicions" (Dkt. #74 at p. 3).   However, "[g]enerally, neither [the Fifth Circuit] nor the district courts of [the] circuit will 'review arguments raised for the first time in [a] reply brief.'"   *RedHawk Holdings Corp. v. Schreiber Trustee of Schreiber Living Trust – DTD 2/8/95*, No. 20-30157, 2020 WL 6683017, at *2 (5th Cir. 2020). Despite the general rule, "a district court may consider arguments and evidence raised for the first time in a reply brief . . . 'so long as it gives the non-movant an adequate opportunity to respond prior to a ruling.'"   *Id.* (citing *Thompson v. Dall. City Attorney's Office*, 913 F.3d 464, 471 (5th Cir. 2019) (internal quotations omitted)).   In the present case, Plaintiffs had adequate time to, and

---

[3] The *Schneider* action refers to *Schneider et al v. BMW of North America*, *LLC et al*, No. 1:18-cv-12239-IT (D. Mass. 2018).

in fact did, submit a sur-reply addressing the new argument propounded by Defendant.  Despite the Court's ability to consider Defendant's newly raised argument, it is unpersuasive, and the Court does not address it further.  *See Daubert*, 509 U.S. 592 (noting that an "expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation").

## IV.  Plaintiffs' vehicles were not suitable for their ordinary purpose

Defendant first contends that Manzari's opinion that Plaintiffs' vehicles were not suitable for their ordinary purpose "is not reliable because it is based on Manzari's flawed predicate opinion that the Plaintiffs' vehicles all consumed excess oil" (Dkt. #54 at p. 7).  Next, Defendant argues that "Manzari's opinion is not relevant to this case because [he] does not apply the correct standard for determining whether a consumer vehicle is fit for its ordinary purpose"—namely, that the vehicle "provides for a *minimum level of quality*" (Dkt. #54 at p. 7) (internal quotation omitted) (emphasis in original).  According to Defendant, the "attenuated list of possible problems" propounded by Manzari "does not constitute a reliable and relevant opinion on . . . whether the subject vehicles were fit for their ordinary purpose and such opinion should be excluded" (Dkt. #54 at p. 7).  The list of possible problems include the possibility of vehicles to be driven low on oil and subsequently damage to the vehicle, potentially leaving a person stranded.

Plaintiffs respond that "[Defendant]'s application of th[e] general [warranty] law to Mr. Manzari's opinion was fatally flawed because [Defendant] once again misquoted Mr. Manzari" (Dkt. #64 at p. 11).  To that effect, Plaintiffs allege that "the failure in functionality about which Mr. Manzari opined was not just the need, hassle, or aggravation of having to add additional oil, but the risk of running the vehicle too low on oil, which leads to the risk of major damage and/or becoming stranded" (Dkt. #64 at p. 11) (emphasis omitted).

Because Manzari's predicate opinion that the Plaintiffs' vehicles all consumed excess oil is not so flawed as to warrant exclusion, the Court will only address Defendant's second argument—that Manzari did not apply the correct standard for determining whether a consumer vehicle is fit for its ordinary purpose.

Although "[a] product which performs its ordinary function adequately does not breach the implied warranty of merchantability merely because it does not function as well as the buyer would like, or even as well as it should," a "seller may be liable for breach of an implied warranty" if the product is defective. *Gen. Motors Corp. v. Brewer*, 966 S.W.2d 56, 57 (Tex. 1998). A product is defective for warranty of merchantability purposes when the condition of the product "renders [it] unfit for the ordinary purposes for which they are used because of a lack of something necessary for adequacy." *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 444 (Tex. 1989).

Manzari opines that Plaintiffs' vehicles were not suitable for their ordinary purpose because "when a vehicle consumes excessive oil, the driver runs the risk of running the vehicle too low on oil, causing major damage and/or becoming stranded" (Dkt. #54, Exhibit 1 at p. 25). Manzari references the Subject Vehicles' Owner Manual and Subject Vehicles' Service and Warranty Information in support of his opinion. Manzari notes that nowhere in those documents was the necessary procedure of adding oil in-between services explained to the vehicle owners. Further, neither the "Subject Vehicles' Owner Manual or Service and Warranty Information state that it is normal for the engine to consume[] 1 quart of oil per 750 miles [or] that owners should add 2 quarts of oil regularly between the oil changes once a message calling to add engine oil appears" (Dkt. #54, Exhibit 1 at p. 26).

Manzari's opinion is based on sufficient facts and a reliable methodology. Manzari has stated that the valve stem seals in the N63 engines were defective throughout his report. A

12

defective product opens the door—at a minimum—to a breach of the implied warranty of merchantability claim.  Manzari has also noted that the N63 engines do, in fact, lack something necessary for adequacy—oil.  Major damage may result to a vehicle if driven without an adequate amount of oil.  This major damage may leave drivers unable to operate their vehicle, which is, presumably, the purpose for which the vehicle was purchased.

The Court will give the jury the correct law on breach of the implied warranty of merchantability and will also instruct the jury to apply the law as provided to them.  Defendant has the opportunity to cross-examine Manzari.  Defendant also has the opportunity to present evidence that contradicts Manzari's opinion and to carefully instruct the jury on the burden of proof.  Defendant may also highlight the perceived inconsistencies between Manzari's testimony and the applicable law, if any.  Manzari's opinions are not "so unreliable as to warrant exclusion under *Daubert* and Federal Rule of Evidence 702."  *Bear Ranch, L.L.C. v. Heartbrand Beef, Inc.*, 885 F.3d 794, 803 (5th Cir. 2018).

## V.      The value of Plaintiffs' vehicles were each substantially reduced by defective valve stem seals

Defendant mounts three challenges to Manzari's diminution of value opinion: (1) this opinion relies on Manzari's flawed conclusions regarding excess oil consumption and defective valve stems; (2) this opinion is entirely speculative as to what consumers would or would not be willing to buy; and (3) this opinion is irrelevant because it applies an improper standard to determining diminution in value.

Plaintiffs offer responses to each contention.  First, Plaintiffs argue that Manzari's conclusions are not flawed.  Next, Plaintiffs contend that Manzari's opinion "is based on Mr. Manzari's knowledge of internal combustion engines, along with his expertise in the analysis and diagnosis of customer complaints and vehicle performance" (Dkt. #64 at pp. 12–13).  Plaintiffs

13

state that Defendant's third challenge to the opinion is incorrect because "the report did employ the proper standard to determining diminution in value" (Dkt. #64 at p. 13).

The Court agrees that Manzari's conclusions regarding excess oil consumption and defective valve stems is not so flawed as to render it excludable under *Daubert* and Federal Rule of Evidence 702.  The Court will, however, address Defendant's second and third challenges to Manzari's diminution of value opinion.

Defendant asserts that Manzari's opinion is "entirely speculative as to what consumers would or would not be willing to buy" (Dkt. #54 at p. 8).  An expert's opinion must "be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief" to meet the requisite standard of reliability.  *Curtis v. M&S Petrol., Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 590).  Manzari utilized his own knowledge of internal combustion engines and his experience in dealing with the analysis and diagnosis of customer complaints and vehicle performance in reaching his conclusion that "no consumer would have purchased one of the Subject Vehicles had the defective valve stem seals been disclosed" (Dkt. #54, Exhibit 1 at p. 26).  Manzari has thirty-five years of experience in the automotive industry.  Manzari opened his own independent repair facility in 1987, where he "focuse[d] on diagnostics, general repairs and maintenance[] for all makes and models of vehicles" (Dkt. #54, Exhibit 1 at p. 3).  Manzari subsequently opened two subsidiaries.  One of the subsidiaries "focused on Computer Diagnostics and engine performance," while the other "was a full[-]service transmission rebuilding facility, repairing automatic and standard transmissions on all makes and models of vehicles" (Dkt. #54, Exhibit 1 at p. 3).  While Manzari undoubtedly has vast experience in the automotive industry and in dealing with customers, the sweeping statement

14

that no consumer would have purchased one of these vehicles is unsupported by the facts presented.

No facts indicate that Manzari polled potential consumers or attempted in any way to garner public opinion on whether anyone would purchase a vehicle with an oil consumption defect. Manzari considered several categories of documents when reaching his opinions—none of which appear to discuss consumer reactions to the specific defect alleged by Plaintiffs.  Manzari's statement alone offers no more than his subjective opinion that no consumer would buy the Subject Vehicles—thus, the Court agrees that the opinion must be struck.  *See Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.").  Manzari may not, therefore, state that no consumer would buy the vehicles.

Plaintiffs contend that "Manzari has opined that a BMW with excessive oil consumption is unmerchantable; i.e., no one would knowingly buy it until and unless it was repaired" (Dkt. #64 at p. 14).  Plaintiffs appear to misstate the definition of "unmerchantable," however.  A product is "unmerchantable" if it is "unfit for its ordinary purpose."  *AIG Europe, Ltd. v. Caterpillar, Inc.*, No. 19-40934, 2020 WL 6494228, at *4 (5th Cir. 2020).  The Parties have not cited to, and the Court has not found, any authority supporting the definition offered by Plaintiffs.  Manzari has offered sufficiently reliable opinions that the N63 engines, and necessarily the cars the engines are contained within, were unfit for their ordinary purpose.  In fact, Manzari offers the opinion that "the subject vehicles were not suitable for their ordinary purpose, which is providing safe and reliable transportation" (Dkt. #54, Exhibit 1 at p. 25).   The exclusion of Manzari's statement that no consumer would have purchased one of the subject vehicles therefore does not prove fatal to Manzari's overarching opinion on diminution of value or unmerchantability.

Defendant also claims that Manzari's opinion is irrelevant because it applies an improper standard to determining diminution in value.  Specifically, Defendant contends that Manzari's opinion "is also the product of [his] flawed predicate opinion that every Plaintiff vehicle has leaking valve stem seals" (Dkt. #54 at p. 8).  Further, "even assuming that a given vehicle is found to have leaking valve stem seals, Manzari provides no sufficient facts or reliable methodology for opining that the remedy for that defect is to replace the engine" (Dkt. #54 at p. 8).  Because the Court has already determined that Manzari's predicate opinion is not so flawed as to warrant exclusion, the Court will therefore only address Defendant's second argument.

Manzari offers the opinion that "where the cost of replacing valve stem seals approaches the cost of replacing the engine, as is the case with the N63 Engines, a more prudent approach is to replace the engine" (Dkt. #54, Exhibit 1 at p. 26).  Manzari then notes that replacing the engine is "a repair [Defendant] itself has originally recommended" (Dkt. #54, Exhibit 1 at p. 26).  Manzari cites to sufficient facts when rendering his opinion—namely, facts contained within two of Defendant's internal Measures.  The recommendation to replace the engine came not only from Manzari, but also from Defendant itself—"engine replacement was required where no cause for the high rate of oil consumption could be found" (Dkt. #54, Exhibit 1 at pp. 18–19) (citing Dkt. #54, Exhibit 8 at p. 12 and Dkt. #54, Exhibit 8 at p. 31).  Manzari's application of the sufficient facts to his vast knowledge and experience in the automotive industry lend themselves to a reliable methodology.  Thus, the Court declines to exclude Manzari's opinion on diminution of value.

## CONCLUSION

It is therefore **ORDERED** that Defendant's Motion to Strike and Exclude Plaintiffs' Expert Designation (Dkt. #54) is hereby **GRANTED in part and DENIED in part**.

Manzari is precluded from testifying that no consumer would purchase one of the subject vehicles.  All other relief requested is denied.

**SIGNED this 11th day of December, 2020.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE